On second case of the morning call, 210-063, Edward Lindenmulder v. Board of Trustees of the Naperville Firefighters' Pension Fund and the City of Naperville. On behalf of the Adelante, Mr. Anthony G. Argyros. On behalf of the Naperville Firefighters' Pension Fund, Ms. Carolyn Welch Clifford. And on behalf of the City of Naperville, Mr. Michael W. DeSando. Good morning, counsel. Mr. Argyros. May it please the court, counsel. It is my honor this morning to appear before this court on behalf of Edward Lindenmulder, a disabled member of the Naperville Firefighters. This case is brought before the court on administrative review of a pension board finding which denied Mr. Lindenmulder benefits under 4-110 and 4-110 of the pension code, the duty disability and occupational disability sections of the code. This case I respectfully submit presents issues of first impression as to standards of proof for 4-110.1 and 4-110 and also as to the effect to be given to the legislative findings contained in the preamble to 4-110.1. There is no case law to date which interprets 4-110.1, especially in its present form. Mr. Lindenmulder served 24 years in fire service, the last 18 of which with the City of Naperville. And as was demonstrated so heroically on 9-11, it is the men and women in police and fire service who bravely march into deadly smoke, fire, and flames of burning buildings while we members of the public run to safety. Counsel, not to diminish the importance of what your client does and our gratitude to all firemen, didn't he wear a protective breathing apparatus when he went into fires and there were particular rules about when it came off and how long it stayed on and when it could come off? Weren't there other protections in the firehouse itself when the trucks were pulled in so that the diesel fumes would not get into the firehouse? So weren't there a number of protections for your client? Yes, there were. None of the protections were perfect by any means. For example, with respect to the SCBA gear, there were issues in the record concerning how much air supply the SCBA gear can provide and whether it can supply all of the needs of a firefighter, particularly under stress, where it doesn't supply all of the needs. So the rest of the air comes from the ambient air, regardless of where they are. And if it's in a fire, then that's where it's coming from. The next issue, Your Honor, was that the firefighting duties with respect to a fire do not end when the flames are out. They continue during a process that's called overhaul. And during the overhaul process, it was disputed in the record that the firefighters are no longer wearing their SCBA gear and that while they are on the scene, they are still taking in the noxious fumes and smoke. In addition, there was testimony that, and this was, again, undisputed, that the gear that the firefighters wear as they enter these premises become permeated by these toxins and that the gear then off-gasses into the premises where they work. They are literally living in it 24 hours and then with 48 hours off as is their shift. As to the diesel exhaust issue, yes, it is correct that there was a ClimaVet system or a Niedermeyer system that was there which was designed to exhaust or remove the exhaust from the premises. However, the testimony was undisputed that because of the configuration of Station 3 where Mr. Lindemulder was for most of his time, including the time when he became disabled, that that system could not be attached before the apparatus would come into the premises. And there was also testimony that was, again, undisputed by numerous members of the fire department who were there at Station 3, including a captain, Captain Sanders, who testified that those premises are permeated by black dust and that although... I would respectfully disagree. I think that when the doctors were not provided with total information and when the doctors in particular were not advised as to the proper test to be applied in the context of this aggravation of pre-existing condition case, there were the reports that were generated that essentially said this is a smoking case and nothing but a smoking case. I think the testimony of Dr. Garrity showed that it was night and day. When Dr. Garrity was advised as to the applicable standard, that we were talking about an a-causal factor standard, that we are not needing to prove that it's a substantial cause or most of the cause or a big cause, that an a-causal factor was enough, Dr. Garrity's testimony changed night and day. He was completely on board and fully supportive of the claim under 4-110 or 110.1. As to Dr. McGilligant, again, we saw very significant changes in his testimony where he went from a report saying this is a smoking case to one where he acknowledged, well, once we start talking about all these chemical components, frankly, I'm not completely familiar with them, but once we start talking about them, I have to admit, it could be a competent cause. It's a possible aggravating factor. And then when we added, when we took as a hypothetical the legislative findings contained in 4-110.1 and presented those to Dr. McGilligant as a hypothetical, he said yes. All right. But now, counsel, once you have these legislative findings, that's not a fait accompli. There still has to be a connection. It has to be shown that the condition resulted from the person's services as a firefighter. That is absolutely correct. And how was that done? I mean, doesn't that require, for example, even an expert opinion? Well, and we had that. Dr. Geraghty gave an expert opinion that when you take into account what the standard of proof was and the exposures, there was a causal connection. Dr. McGilligant, although he vacillated, I mean, again, you start talking about particular chemicals and exposures with Dr. McGilligant, you get to his answer as to 4-110, that yes, it was possible. Yes, it's a competent cause, and typically that is sufficient to warrant and award benefits. But then as to 4-110.1, when we said, now take these facts as true, take it as true that Mr. Lindemulder was subjected to exposure to extreme heat or extreme cold in certain seasons while performing his duties that he was required to work in the midst of and subject to heavy smoke, fumes, and carcinogenic, poisonous, toxic, or chemical gases from fires. He said, as long as we assume that means he's breathing it, I agree. I agree what? That there's a cause and effect relationship between his exposures and his disability. But didn't he also say that it was very, very likely that even if he weren't a firefighter, he would still have a COPD? There was testimony to that effect, and I believe that that is not a bar to compensability in this claim and it's not a bar as a matter of law. And that's where the cases of CISPRO and Twice Over Clean coming from our Supreme Court deal directly with this issue. Essentially what we have in those two cases are a couple of important statements. And first of all, I respectfully disagree with the board and city that these cases are just standard of review cases. I mean, we didn't have the Supreme Court taking these up to talk about the vagaries of standard of review. We didn't have amicus briefs filed in CISPRO because it was a standard of review case. These cases are substantive cases. And what the court told us in CISPRO at page 212 of 207 L2D, quote, we have never found a causal connection to exist between work injury and then, in a further analytical step, denied recovery based on a normal daily activity exception or a greater risk exception. In Twice Over Clean, the Supreme Court says at 214 L2D 413, if a causal connection between the work activity and the injury is shown by competent testimony, no limitation or exception to compensation can be imposed to defeat a right to recovery. But you need a causal connection. We do. But the question that Your Honor posed was, and if he would be in the same place, if there's testimony saying that he would be in the same place, is that enough? Twice Over Clean and CISPRO tell us the answer is yes. And, in fact, that exact argument was rejected in the Twice Over Clean case where we're saying, you know, he's a heart attack waiting to happen. Similarly, in CISPRO, we have a diabetic with a Charcot foot. Well, he could have had that anyhow. That was also rejected in the workers' compensation case of Shelton versus Industrial Commission at 267 LF 3211. The same type of argument was made and rejected. What I believe, there is a significant difference between our case and CISPRO and Twice Over Clean, and it's this. In CISPRO and Twice Over Clean, we're dealing with preexisting conditions that are chronic, where then we have some kind of trauma that's superimposed upon it, and the condition goes south after that. What we have in this case is not that. We have a chronic condition that is slowly and steadily progressing, with the occupational exposures being on board and contributing to the progression of the condition all along. So to change the fact of CISPRO and Twice Over Clean, you'd say, in Twice Over Clean, if the work conditions had caused a worsening of the coronary artery disease, you wouldn't even be talking about normal daily activity because you'd say it caused the underlying condition that was then activated. If in CISPRO we had conditions at work that aggravated the underlying diabetic condition, and then he has an injury, you would say, well, we're not worried about normal daily activity. In this case, and we were talking about a chronic condition that is made worse progressively as you go by the occupational exposures, the de minimis exception argument that was created by the pension board with the legal authority of Dr. Moisen, who's not a doctor, lawyer, or legislator. He's not a doctor? I'm sorry, not a lawyer, not a judge, not a legislator. I thought he was. Yes, doctor he is, but who has no competence on the law and who's 100% incorrect in his assertions concerning de minimis cause. The de minimis cause argument, I think, is the functional equivalent in a case like this to the normal daily activity exception that we see in cases like CISPRO and Twice Over Clean where you have that trauma superimposed. You seem to disagree with Dr. Moisen. I mean, you pointed out in Dr. McGillicott and Dr. Garrity's testimony, pieces of their testimony where perhaps their opinions or the argument have changed. Where did Dr. Moisen's opinion change that the work conditions did not exacerbate this COPD at all? Well, I think they were simply clarified. I mean, in his report he uses... Did his opinion change in the fashion that you cited to Garrity and McGillicott? In a different way, but yes. I mean, to the same result. And let me explain. In Dr. Moisen's report we see the de minimis theory there. Well, he talks about de minimis risk. He doesn't talk about de minimis causation. I mean, there may be a difference there. Correct. But then when we explore that with Dr. Moisen, he basically admits that yes, you know, I can't exclude it and it may have caused this, you know, by one-tenth of 1% is what he says. One-tenth of 1%? The risk may have been there at one-tenth of 1%. I mean, I didn't see in the record anywhere where he said that the work activities caused it in one-tenth of 1% or caused it in any minimal amount. Maybe you could point that out to me. I would be happy to. And it's actually been cited in the briefs and also in the... well, in the briefs by both sides. But hold on one second and I'll be happy to show you exactly where that is. If you want to move on, I'll look for it. Very well. Thank you, Judge. Thank you, Your Honor. Couldn't one argue that a chronic condition, there are a lot of chronic conditions that people may have that aren't caused by their line of duty or by their occupation that are certainly going to be made worse if they continue to work or it's an occupational, based upon the occupation. I guess my question is here with respect to this OPD. It's just such an unusual ailment versus any other ailment or chronic condition in light of the fact that it's smoke and we're talking about a firefighter. Do you understand what I'm saying? I do. It's so intertwined that is it not a tough burden with the doctor's testimony? How do you get past that he's entitled to the line of duty pension? Would it be easier without the smoking on board? Sure it would, Your Honor. Sure, sure. Then we look to workers' compensation cases again. And let's look at cases like the Freeman coal case and the Shelton case where you have smokers with pneumoconiosis, coal miners' disease, and where it's conceded that smoking was a part and parcel of why they are where they are with COPD. In those cases, it was not a bar to compensability. Here, especially as we look at 4-110 of the pension code, we can see that the legislature is creating extra protections for firefighters regarding their cardiopulmonary status. And let me explain why. I think there's an easy reason why. And that is because sometimes it takes a while for the science to catch up with the law. So we've seen that in many instances. We've seen that, for example, in the tobacco cases. How many years was it that the tobacco plaintiffs just lost and lost and lost? I've seen it in my own practice where I handled a workers' compensation case involving diesel exposure in a firefighter. And it was one of the first cases in the country to prevail. And the reason it prevailed is because the science had finally caught up. Up until that point in time, you had a lot of railroad workers trying to win those cases, but they were losing on Daubert. You know, they couldn't get over the Daubert hump. But afterward, as the science caught up, it showed that the cases were compensable. So you see the legislature taking the epidemiological data out there, saying, why are these firefighters dropping dead so early? Why are they having these increased incidents of lung problems? And, you know, because you don't have these firefighters out there with somebody measuring every chemical substance and saying, you were here for so long. I mean, they aren't lab rats. They aren't working in a lab. And so the legislature's putting those legislative findings in there to say, these things we know to be true. Whether you've got a Daubert or can satisfy Fry, we're not worried about that here, because we know these things are true. And that is why the phrase, subjected to, is included in those legislative findings. And the board has utterly ignored them and studiously avoided talking about them through the briefs. Thank you, counsel. Thank you. All right, you'll have time on rebuttal. Ms. Clifford, I understand you and Mr. DeSanto are going to share your time. And we will have a buzzer go off for you. Very well, thank you. Okay, thank you. May it please the court and counsel, thank you for this opportunity to explain to the court why we believe you need to uphold the board's decision to deny this plaintiff a line of duty or an occupational disease pension. I think your questions indicate that you are well versed on what the three independent medical evaluating physicians said in this matter and understand where the board's decision resulted from. I think what fundamentally is happening from the plaintiff's perspective is they are looking for you to apply a strict liability type approach to the interpretation of the statute that our board has to implement. And really the essence of the case is, has the plaintiff met his burden? That either the disability, the COPD, resulted from the cumulative effects of the acts of duty or resulted from his service as a firefighter. And the board concluded that that burden was not met. All three independent medical evaluating physicians answered the appropriate questions as they were posed to them under the Illinois Pension Code, which required that there be cause. And when the board considered those medical opinions and looked at the nature of the service of this particular firefighter, the exposures that he would have had, the protections that he would have had, and considered the totality of the evidence, it came to the conclusion that the plaintiff did not meet his burden, that any alleged acts or exposures were a cause or even a contributing cause to the disability. Well, how do you respond to the appellant's testimony and witnesses that he brought forth at the trial with respect to this Station Number 3? And that there were people there who weren't smokers, who weren't exposed to cigarette smoke, but were having effects from sleeping in this Station Number 3. I really think that that Station 3 scenario was really a red herring. For one thing, the other firefighters that testified as to ill effects they felt from being at that station had different kinds of conditions. You might remember that Jody Jones, who was one of the firefighters, she had a different type of respiratory problem, but interestingly, a respiratory problem that involved exposure to animal handling. Remember, she had chickens. She lived on a farm. And when she would have those type of reactions, the reactive airway type situations, it was transient. She might feel ill for a short period of time, but then go back to her baseline. And I think that's one of the fundamental issues in this case, is there are going to be things that these firefighters are exposed to from time to time that may, if they have an underlying condition, a long condition of COPD or other type of reactive airway type situation, that will temporarily flare up symptoms. But symptoms are different than cause. You can aggravate and create symptoms, and then it goes away. Dr. Moisen, who's our NFPA doctor who understands these things so specifically, explained that very beautifully in his testimony, that there is a fundamental difference. And even if the flare-up occurred with this particular firefighter with his COPD symptoms, he would go back to his baseline, which was a condition caused by smoking cigarettes. So de minimis, in his view, was transient. Right. And the equivalent of or definitional context. He talked about clinical significance, that when he's presenting a patient and he's looking at all the things that could contribute to cause of what this condition is, that the risk that the firefighting exposures caused were de minimis. They are so far down the line of possible causes that they don't even play a factor from a clinical significance sense. And I think that's the fundamental misunderstanding that Planoff has about the causes. Did he say that the work caused the COPD by one-tenth of one percent or something like that? No. You were accurate when you noted that he was talking about risk. There was a very small risk that it could be a cause. And I think that what Planoff is asking you to do is take legislative findings and make them almost like a strict liability type situation that we just assume that the firefighter's lung condition is caused by the job. But clearly the statute requires that they result from being a firefighter. And I think there's a couple of clues that support that notion. For one thing, the word solely came out of the statute in 1975, and later in the Chicago statute came out in 2004. So it used to have to be that you had to solely prove it came from being a firefighter. It just needs to be a cause now, resulting from service. I think a second clue is the fact that for cancer, we view that differently under this statute, and there's different types of proofs, specifically looking to the International Agency on Cancer's most recent scientific evidence as to what cancers do result from heat and radiation. So it depends what type of disease you have as to how you judge the statute. And finally, when we look into the changes in the workers' comp statute in 2008, which now makes it rebuttably presumptive that service causes lung and heart conditions, I think that further shows that our pension code is looking for causation and making those judgments as science can show us, where do these conditions come from? What are they caused by? And particularly as the fire service changes. The majority of their calls are ambulance calls. They are exposed to fires like they used to be back in the old days. Every community has a different experience. Every firefighter has a different experience. And that's why this board made sure they reviewed the history of his fire responses and his exposure to the hazardous type conditions that he had, in trying to really flesh out, is there cause? Did he have risk? And then was there cause? And they concluded there just wasn't. I think at this point I'll turn it over to my colleague, and he can talk more about the evidence that supported the board's decision. Thank you. Mr. DeSanto? May it please the court, counsel. Good morning. Mike DeSanto on behalf of the city of Naperville. Appreciate this opportunity to address the court. Ms. Clifford did an excellent job, I believe, of explaining the causation problems that the plaintiff has in this case. The doctor's testimony was all very significant, being that there was no causation between COPD and either diesel inhalation or inhalation of smoke fumes. As I look at the plaintiff's case, I see four positions that he's trying to take. That his COPD was causally connected to diesel inhalation, or his COPD was causally connected to smoke fume inhalation. In both of those situations, under 110, 110, concerning the line-of-duty disability, he needs to show two things. He needs to show exposures, and he also needs to show causation. And Justice Zant, I think you picked up on the fact that he struggles with even exposures in the record in this case. Nowhere in the testimony of Mr. Lindenboulder does he say, I inhaled diesel fumes. Nowhere in the record does he say, I inhaled fire smoke. The testimony is that there's a fire engine that's pulled into a garage, that there's a Neiman system attached, which sucks up the diesel exhaust. At times, that was slow to get attached. But there's no testimony that Lindenboulder was at that area when it was slow to be attached. There is testimony that the huge garage doors are open, and then there's air flow between there that would dissipate that. Additionally, there's some indication in the record that there was a concern whether diesel was leaking into the HVAC system. Captain Ferrari, who has been on the fire department for many years and achieved the rank of captain, testified that, based on his knowledge of how fumes travel, there's no way, based on the location of the intake for the HVAC and location of the exhaust from the fire truck, that they could have been mixed-matched, not to mention that there was filters. There was some discussion, I heard from the justices, concerning the black soot that was in Station 3. There's also testimony from Captain Ferrari that he acted on that. They went out there and they tested it, and it was found to be nothing more than dirt. There was no mold, there was nothing else that would be significant. Firefighter Lindenboulder was also asked about his exposure to fire smoke, and the record is very weak on that. He does not recall any significant fires that he has attended, and he admitted that when he did go to a fire, and he approximated it at maybe one fire every other month, one fire per month to every other month, that he wore his SCBA gear, which prevents him from inhaling any of that fire smoke. Nowhere in the record does he say, I inhaled fire smoke. So, just on the case of exposures, the plan fails under 110. And then we go to the causation, where there is just ample evidence on the record of the three doctors and their written opinions initially testifying that neither smoke inhalation or diesel can cause or contribute, aggravate or accelerate to COPD. The second part of this would be 110.1, the occupational disease portion, where there are presumptions concerning exposure. But I would present to the court that diesel inhalation is not one of the presumptive exposures. The exposures that are talked about in section 110.1 say, exposure to extreme heat or extreme cold, required to work in the midst and subjective to having smoke fumes, and carcinogenic, poisonous, toxic, or chemical gases from fires. So in those cases, we're talking about the fumes that come from fires. So under 110.1, there's no presumption of exposure to diesel. So the plan fails there. Admittedly, there is a presumption concerning the inhalation of fire smoke fumes. But again, on that one issue, we go to causation. And that's why we have three experts. Plano has been all over, twice CISPRO and twice over CLEAN, for the standard, for the ACAU standards. It's important to point out that in both of those cases, there were competent medical opinions that there was a causal connection. At the lower court, both of the workhouse arbitrator and the industrial commission, there was a finding of compensability. So on review, they're looking at a fact pattern where those findings had already been made. We don't have that here. The pension board is the trier of fact. They heard the five days of testimony. They heard the experts. They're able to question the experts. And at the conclusion, the pension board, that includes three firefighters, found unanimously that there was no causation concerning Firefighter Malina Mulder's fire service and his COPD. And then our standard of review is? Manifest way of the evidence, certainly. And that's all I have unless there's any other questions. Do we have anything there? I don't. Thank you. Thank you. Mr. Argyros. Mr. Argyros, can you comment on the standard of review? Because I know you differ on the causation issue. You want me to address standard of review? I believe that it is clearly an erroneous standard because we have an erroneous legal test being applied with the de minimis cause exception that's been carved out by the board that is absolutely unsupported by any law. And contrary to the terms of the statutes, neither of which include any adjective before resulting from. That's the test. I hate to be so colloquial with it, but it's that whole thing about you can't be a little bit pregnant. It either is or isn't a cause. There is no adjective to be added to that. To answer your Honor's question earlier about Dr. Moisen, and with all due respect to counsel, the assertion that Dr. Moisen did not say that it was one-tenth of one percent of cause is absolutely incorrect. And I'm referring to page 93 of his testimony, where, here's the question. Question, that's a good point. So what you are saying, when you say de minimis, is that the exposures of firefighting, for example, played a role, but he would have still had COPD at this time and place anyhow. Is that correct? Answer. I'm saying if he was an office worker and the same individual and he smoked the same amount, it would be my opinion that he would be in the same place at this point clinically. That is correct. Now, could it have aggravated lung disease by one-tenth of one percent? Could it have given him a few more days he would wheeze? There is no way I could exclude that. But it would have been clinically relevant, and the answer there would be no. Here's the thing with Dr. Moisen. Dr. Moisen, you have to read his testimony very carefully. It was something I actually just noticed as I was going over things, preparing for this argument. He uses adjectives in places that make what he says, I mean, it really contradicts the rest of what he's saying. For example, on page 79, it's actually page 29 of his testimony, page 79 of the decision, I'm sorry, page 79 of his testimony, page 29 of the pension board decision, he talked about the firefighter COPD studies that had been done in New York, and he tried to say, well, these don't show. But what he really said was, they didn't show anything other than a minor acceleration in their COPD, and he was talking in the present tense. So he said, the old studies had shown a causation, but other than that, they haven't shown anything but a minor acceleration in COPD. So I tried to seize upon that in the follow-up question, and then he kind of reverted back to talking about the old test. But this COPD wasn't resulting from the service as a firefighter. It was aggravated by a service as a firefighter. I believe Dr. Gary says that quite clearly. Dr. McGillicud says that quite clearly. When you add in the 4-110.1 preamble and legislative findings, he says, yes, this is not an equivocal maybe. There he says yes. And Dr. Noysen, as I just read into the record, acknowledges that the service as a firefighter instead of his fire service, he could not exclude it being a partial cause, which is all our burden is. I'll also say something about the standard of review. I think that by its actions, in the case of Kazookas versus the Chicago Police Pension Fund, and I know I'm going to get the exact name of it wrong, but the Kazookas case of our Supreme Court just came down within the last year. Our Supreme Court showed us that administrative review is a very substantive right and that the courts sitting in review are not to just rubber stamp what a pension board does. The Supreme Court in Kazookas, in reversing a pension board denial of benefits of the police officer in that case, reversed findings of credibility, findings that were made by the board when it ultimately found they weren't supported, awarded the benefits in spite of the fact that there was one physician out in the cold who was saying that he didn't think there was a cause and effect relationship between the disability and any injury. And I think we also can see some difference between Scalise's case, which the respondents represent in their briefs. Scalise was an asthma case for a firefighter. And in Scalise you have, it's a difficult case to read, I have to admit. I think it's hard to read. But once you, the ultimate conclusion of the court was this, that out of four doctors, I think a treater and three reviewing doctors, examining physicians, only one of them was clearly supportive on causation, and therefore when the pension board didn't grant benefits, it was affirmed. Then you contrast Gloss, which is the case that we rely on, and it was exactly the opposite. There you have the treaters and the two of the three pension board attorneys, or doctors, rather, who are finding that there was a cause and effect relationship between the work and the disability. And then you have the one that's equivocal on the other way, and there it's against the manifest way of the evidence, and you reverse. So what you're saying is we really should substitute our judgment for the board's judgment when it relates to findings of that? So I'm saying that this court should perform its duty of administrative review in the same manner as we saw the court do in Kazukas and Gloss. One last thing. There was also the assertion about Captain Ferrari and the testing about diesel. There was no testing for diesel, and Captain Ferrari actually stated, what happened was there was a test for mold that did not indicate that there was the presence of any mold, and that testing did not test for any of the components of gases or particulates of diesel exhaust. So, you know, it just doesn't apply here. The testimony – very well. Thank you. The court will take the matter under advisement.